DEPARTMENT OF TRANSPORTATION v INITIAL TRANSPORT, INC

Docket No. 272560. Submitted April 17, 2007, at Detroit. Decided July
26, 2007, at 9:00 a.m. Leave to appeal sought.

The Michigan Department of Transportation brought an action in
the Wayne Circuit Court against Initial Transport, Inc., Employers
Mutual Casualty Company, Great West Casualty Company, and
Kirk National Leasing Company, seeking approximately $3.5 mil-
lion for damage to a freeway overpass. The damage occurred when
a gasoline tanker exploded after it detached from a semi-tractor
that was owned by Initial Transport and operated by one of its
employees. Employees Mutual, Initial Transport's no-fault in-
surer, made payments totaling $57,957.28 to environmental
cleanup companies engaged by the plaintiff and offered to pay the
plaintiff up to $1 million, the property protection insurance limit
under its policy and the no-fault act, upon satisfactory proof of at
least $1 million in property damage and the execution of a release
of further liability on the part of Employers and Initial Transport.
The court, Kathleen I. Macdonald, J., granted summary disposi-
tion for the defendants, ruling that the plaintiff's recovery is
limited to $1 million under the property protection insurance
benefit maximum set by MCL 500.3121(5) of the no-fault act,
notwithstanding the plaintiff's argument that MCL 480.11a(1)(b)
of the Motor Carrier Safety Act (MCSA), which adopted certain
federal motor carrier safety regulations, requires an additional
minimum of $1 million in financial responsibility for transporters
of hazardous materials such as gasoline. The court also denied a
motion by the plaintiff for penalty interest of 12 percent a year
under MCL 500.2006 of the Uniform Trade Practices Act from a
date 60 days after satisfactory proof of loss was received by
Employers for the $942,042.72 it conceded was payable to the
plaintiff as property protection insurance benefits under the
no-fault policy. The plaintiff appealed.

The Court of Appeals held:

1. The trial court erred by granting summary disposition to the
defendants. The MCSA imposes potential liability in addition to
that imposed by the no-fault act on motor carriers carrying
hazardous materials. The Legislature's adoption of language stat-

ing the purpose of CFR 387.1, "to create additional incentives," suggests that the regulatory requirements are intended to exert pressure over and above that exerted by preexisting legislation to encourage motor carriers to "operate their vehicles in a safe manner." The MCSA must be read as an overlay to the no-fault act in situations involving the transport of hazardous materials by motor carriers in light of the fact that 49 CFR 387.9 distinguishes between hazardous cargo and nonhazardous cargo in setting financial responsibility limits for motor carriers and the fact that the no-fault act does not address hazardous cargo. Finally, inasmuch as CFR 387.5 defines "financial responsibility" as "the financial reserves (e.g., insurance policies or surety bonds) sufficient to satisfy liability amounts set forth in the subpart covering public liability," benefits from such insurance policies must be recoverable by parties injured by motor carriers.

2. The trial court erred by denying the plaintiff's motion for penalty interest as provided under MCL 500.2006. Section 2006(4) provides in part that a third-party tort claimant is entitled to interest of 12 percent a year from a date 60 days after satisfactory proof of loss is received by a liable insurer if, among other things, the claim is not reasonably in dispute. In this case, at the time the trial court entered an order requiring the plaintiff and Employers to execute a mutually agreeable release and requiring Employers to pay the plaintiff $974,042.72 upon execution of a release, the amount owed to the plaintiff under the no-fault policy was no longer in dispute. The defendants have not cited any authority in support of their position that an insurer can avoid paying penalty interest by requiring a release as a condition of payment on a claim. On remand, the trial court must order Employers to pay 12 percent interest from a date 60 days after satisfactory proof of loss was received.

Reversed and remanded for further proceedings.

WHITBECK, C.J., concurring in part and dissenting in part, agreed that the trial court erred by denying the plaintiff's motion for statutory penalty interest for Employers' failure to unconditionally tender the balance of the $1 million in no-fault property protection insurance benefits and that the case should be remanded for an award of such interest. However, Chief Judge WHITBECK disagreed with the majority's conclusion that the MCSA provides property protection benefits separate and above the $1 million limit set by the no-fault act. The MCSA is a regulatory act that simply sets forth minimum amounts of financial responsibility for certain motor carriers and imposes a civil penalty for the failure to comply with those minimum requirements. The MCSA

does not create a private remedy for a third party against an insured or an insurer. The no-fault act is the exclusive remedy available to the plaintiff for the property damage sustained in this case. The trial court's decision that recovery for property damage is subject to the $1 million limit set by the no-fault act should be affirmed.

INSURANCE — NO-FAULT — PROPERTY PROTECTION INSURANCE — MOTOR CARRIERS — MOTOR CARRIER SAFETY ACT — FINANCIAL RESPONSIBILITY.

The Motor Carrier Safety Act requires a motor carrier that transports hazardous materials to maintain a minimum of $1 million or $5 million in financial responsibility, depending on the type of hazardous cargo; for property damage, the protection provided by the Motor Carrier Safety Act is over and above that which is provided under the no-fault act, which set a limit of $1 million in property protection insurance benefits (MCL 480.11a[1][b]; MCL 500.3121[5]).

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Patrick F. Isom, Vincent J. Leone*, and *Joshua W. Gubkin*, Assistant Attorneys General, for the Department of Transportation.

*Sullivan & Leavitt, P.C.* (by *Michael J. Leavitt*), for Initial Transport, Inc.

*Hopkins, Curran & Smith, P.C.* (by *George F. Curran, III*), for Employees Mutual Casualty Company.

Before: WHITBECK, C.J., and MURPHY and COOPER, JJ.

COOPER, J. In this case regarding a claim for property protection benefits, plaintiff appeals as of right from the trial court's order granting summary disposition in favor of defendants,[1] Initial Transport, Inc. (Initial),

---

[1] Defendants Great West Casualty Company and Kirk National Leasing Company were dismissed with prejudice from the lower court proceedings and are not parties to the instant appeal. Accordingly, we will refer to Initial Transport, Inc., and Employers Mutual Insurance Company, collectively, as "defendants."

and Employers Mutual Casualty Company (Employers). We reverse and remand for further proceedings.

On October 6, 2003, a semi-tractor owned by Initial, driven by an employee of Initial, and covered by a policy of no-fault insurance issued by Employers, struck a cement barrier on the left side of the entrance ramp from northbound I-75 to eastbound I-94. The semi-tractor was towing a cargo tank trailer containing gasoline, which detached from the semi-tractor, crossed over the barrier wall, and fell onto the roadway below.[2] The tanker trailer exploded, causing a fire that severely damaged and destroyed parts of the overpass and adjoining structures. Plaintiff's repair costs were approximately $3.5 million, including environmental cleanup, traffic control in the area immediately after the accident, and the cost of having the overpass and adjoining structures rebuilt. At the time of the accident, Initial's primary commercial general liability policy with Employers for the semi-tractor included a $1 million property protection limit. Initial also had a separate excess liability policy with an additional $4 million limit. Employers declined to pay more than $1 million in property protection benefits, reasoning that it was not required to pay more because, under the no-fault act, Initial's liability for property protection damages could not exceed $1 million. Plaintiff filed a complaint to reach the higher limit under the umbrella policy, asserting, among other claims, that the adoption in the Motor Carrier Safety Act of federal regulations for transportation of hazardous materials, MCL 480.11, created an exception to the damages limitation in the no-fault act. Defendants moved for summary disposition, and the trial court granted the motion.

---

[2] The driver of the semi-tractor died in the accident, but his death is not a subject of these proceedings.

Plaintiff first argues on appeal that the trial court erred in concluding that the Motor Carrier Safety Act (MCSA), MCL 480.11 *et seq.*, does not provide property protection benefits that are separate and distinct from the $1 million property protection insurance benefit limit set forth under the no-fault act. Plaintiff contends that because the MCSA requires a transporter of hazardous materials to obtain additional financial security, plaintiff is entitled to recover for property damage that exceeds the $1 million primary no-fault policy limit. This claim presents an issue of first impression in this Court. Because we find that the MCSA would be rendered meaningless if it did not provide protection over and above that allowed by the no-fault act, we agree with plaintiff.

This Court reviews de novo issues of statutory interpretation. *Amerisure Ins Co v Auto-Owners Ins Co*, 262 Mich App 10, 14; 684 NW2d 391 (2004).

The Michigan no-fault act, MCL 500.3101 *et seq.*, requires that the owner or registrant of a motor vehicle maintain property protection insurance. If certain conditions are met,[3] a party suffering accidental property damage in an accident involving a motor vehicle is entitled to seek property protection insurance benefits from the no-fault insurer of the owner of the motor vehicle. MCL 500.3121(1); MCL 500.3125. "Damage to tangible property consists of physical injury to or destruction of the property and loss of use of the property so injured or destroyed." MCL 500.3121(3).

There is no dispute here that approximately $3.5 million in property damages were done to the overpass as a result of the October 6, 2003, accident and that, under the no-fault act, plaintiff is entitled to property

---

[3] See *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 28-29; 528 NW2d 681 (1995).

protection insurance benefits of $1 million against Employers as the insurer of the motor vehicle owned by Initial. There is no dispute that, because the semitractor and the trailer are insured under one policy of insurance and only one accident occurred, plaintiff is precluded under the no-fault act from collecting more than $1 million from Employers. MCL 500.3121(5).[4] The question is whether no-fault benefits are the only remedy available to plaintiff.

Effective January 8, 1996, Michigan adopted portions of the federal Motor Carrier Safety Act and the federal motor carrier safety regulations by enacting the MCSA and, more specifically, MCL 480.11a, which provides, in pertinent part, as follows:

> (1) This state adopts the following provisions of title 49 of the code of federal regulations, on file with the office of the secretary of state[,] except where modified by this act:
>
> (a) Hazardous materials regulations, being 49 CFR parts 100 through 180 except for the transportation of agricultural products for which an exception from the application of 49 CFR subchapter C and 49 CFR subchapters G and H, part 172, is provided under 49 CFR 173.5, is specifically authorized if the transportation is in compliance with this act and other state law.
>
> (b) Motor carrier safety regulations, being 49 CFR parts 40, 356, 365, 368, 371 through 373, 375, 376, 379, 382, 385, 387, 390 through 393, 395 through 399 except for [exceptions not relevant to this proceeding] . . . .

49 CFR 387.1, one of the adopted sections, states: "The purpose of these regulations is to create additional incentives to motor carriers to maintain and operate

---

[4] MCL 500.3121(5) provides that "property protection insurance benefits paid under 1 policy for damage to all tangible property arising from 1 accident shall not exceed $1,000,000.00." This section became effective March 30, 1973; although amended effective December 28, 1993, the amendment did not alter this text.

their vehicles in a safe manner and to assure that motor carriers maintain an appropriate level of financial responsibility for motor vehicles operated on public highways." Under the regulations, "[n]o motor carrier shall operate a motor vehicle until the motor carrier has obtained and has in effect the minimum levels of financial responsibility . . . ." 49 CFR 387.7(a). A private transporter of hazardous material, such as oil or gasoline, is required to maintain a minimum of $1 million in financial responsibility; for other substances, the required minimum may be as high as $5 million. 49 CFR 387.9. A violation of the rules is punishable by a "civil penalty of no more than $11,000 for each violation." 49 CFR 387.17.

To resolve plaintiff's first issue, this Court must interpret whether the Legislature, by adopting the MCSA and specifically MCL 480.11a, intended an exception to the $1 million limit on property protection insurance benefits contained in the no-fault act. We find that MCL 500.3121(5) of the Michigan no-fault act, MCL 500.3101 *et seq.*, is unambiguous, limiting the payment of property protection insurance benefits to $1 million under one policy for damage to tangible property arising from a single accident. However, we also find that the MCSA is equally unambiguous in mandating that motor carriers obtain and have in effect minimum levels of financial responsibility before operating vehicles carrying certain hazardous materials. MCL 480.11a(1)(b); 49 CFR 387.7(a); 49 CFR 387.9.

The issue we must address here is what happens when the no-fault act is read in conjunction with the MCSA. On one hand, no more than $1 million can be paid out in property protection insurance benefits under the no-fault act, yet the MCSA demands minimum insurance coverage of $1 million or $5 million, depend-

ing on the hazardous material being transported. These statutes, when read independently, are unambiguous, but create ambiguity when analyzed together.

Statutory language, unambiguous and plain on its face, may be rendered ambiguous through its interaction with and relationship to other statutes. *People v Valentin*, 457 Mich 1, 6; 577 NW2d 73 (1998); *People v Denio*, 454 Mich 691, 699; 564 NW2d 13 (1997); *Ross v Modern Mirror & Glass Co*, 268 Mich App 558, 562; 710 NW2d 59 (2005). "[A] provision of the law is ambiguous only if it 'irreconcilably conflict[s]' with another provision, or when it is equally susceptible to more than a single meaning." *Lansing Mayor v Pub Service Comm*, 470 Mich 154, 166; 680 NW2d 840 (2004) (internal citation omitted). We find an irreconcilable conflict between the $1 million cap imposed by the no-fault act and the minimum levels of up to $5 million in financial responsibility required of motor carriers carrying hazardous materials by the MCSA. Put simply, if the damages cap is $1 million in all circumstances, then the $5 million minimum is meaningless, and we are not at liberty to render the MCSA entirely nugatory with such a ruling. Accordingly, we conclude that there is ambiguity between the statutes.

Where there exists statutory ambiguity, it becomes necessary to engage in judicial construction to ascertain the legislative intent. *In re MCI Telecom Complaint*, 460 Mich 396, 411; 596 NW2d 164 (1999). Two statutes that relate to the same subject or share a common purpose are *in pari materia* and are to be read in harmony together as one law, even where the statutes make no reference to each other and are enacted on different dates. *State Treasurer v Schuster*, 456 Mich 408, 417; 572 NW2d 628 (1998).

Here, we find that the correct interpretation of the two acts is that the Legislature intended MCL 500.3121(5) to apply to all vehicles, but later crafted, through enactment of the MCSA, an exception with respect to vehicles hauling hazardous materials. This harmonious reading results in both acts maintaining their core meaning and the forcefulness necessary to fulfill their purposes. For the following three reasons, we hold that the later-in-time MCSA imposes potential liability in addition to that imposed by the no-fault act on motor carriers carrying hazardous materials, creating an exception to the $1 million cap for property damage.

First, the state legislature's adoption of the purpose language of 49 CFR 387.1, "to create additional incentives," suggests that the requirements that follow are intended to exert pressure over and above that exerted by preexisting legislation to encourage motor carriers to "operate their vehicles in a safe manner." To hold otherwise would fail to afford the words "additional" and "incentives" their plain and common meanings.

Second, the provisions of 49 CFR 387.9 distinguish between nonhazardous and hazardous property, and set the minimum financial responsibility required to engage in transportation of the two types of cargo at appreciably different levels: $750,000 for nonhazardous materials; $1 million or $5 million for different types of hazardous materials. We must therefore treat the transport of hazardous property as involving the greater risk, meriting additional property protection. Noting that the no-fault act does not address hazardous cargo in any way, and observing the Legislature's clear intent to set financial responsibility guidelines where hazardous cargo is transported, we conclude that the MCSA must be read as an overlay to the no-fault act.

Third, because the MCSA requires motor carriers to maintain minimum levels of financial responsibility, "the financial reserves (e.g., insurance policies or surety bonds) sufficient to satisfy liability amounts set forth in this subpart covering public liability," we are bound to presume that benefits from these insurance policies must be recoverable by parties injured by those motor carriers. 49 CFR 387.5.

The trial court determined that the MCSA is regulatory only, and our dissenting colleague relies on the regulatory nature of the act in reaching his conclusion. Although we recognize that the MCSA does not expressly provide for a private remedy for a third party against an insured or insurer, the Michigan Supreme Court recently affirmed that implied remedies may be cognizable as well: "To determine whether a plaintiff may bring a cause of action for a specific remedy, this Court 'must determine whether [the Legislature] intended to create such a cause of action.' " *City of South Haven v Van Buren Co Bd of Comm'rs*, 478 Mich 518, 528-529; 734 NW2d 533 (2007) (citation omitted).

We note that 49 CFR 387.11, incorporated into the MCSA, MCL 480.11a(1)(b), requires insurers who furnish the necessary insurance coverage to be legally authorized to be "willing to designate a person upon whom process, issued by or under the authority of any court having jurisdiction of the subject matter, may be served in any proceeding at law or equity brought in any State in which the motor carrier operates." This language clearly contemplates actions against insurers to recover mandated benefits. We conclude that the broad language "any court" and "any proceeding at law or equity" implies a remedy for a party injured by an insured.

In addition, "[w]here a statute creates a right or duty not found in the common law, the remedies provided in the statute are exclusive unless they are plainly inadequate or where the act provides no adequate means of enforcement of its provisions." *Kowalski v Fiutowski*, 247 Mich App 156, 162; 635 NW2d 502 (2001); see also *Gen Aviation, Inc v Capital Region Airport Auth (On Remand)*, 224 Mich App 710, 715; 569 NW2d 883 (1997). Here, absent an implied private cause of action, the remedies provided by the MCSA are both inadequate and unenforceable in any meaningful way.

A new duty was imposed under the MCSA on carriers of hazardous materials. In light of that duty, civil penalties, 49 CFR 387.17, or civil infractions, MCL 480.17(1), are inadequate remedies. A carrier is in compliance with the act once the minimum insurance is procured, but the penalties specified in the statute do not address what happens if an insurer declines to pay the amounts actually contained in the insurance policy, $1 or $5 million as mandated by the MCSA. However, the only reasonable purpose for requiring insurance is to effectuate coverage of risk, so although the government retains a cause of action in the event of noncompliance, surely the mere fact that a motor carrier is in compliance does not negate any possibility of actually using the required coverage. It follows that injured parties ought to be able to recover for property damage under the required policies. To rule otherwise would counteract the entire purpose of setting higher minimum limits for transporters carrying hazardous materials.

While we acknowledge that the MCSA's minimum financial responsibility limits apparently cover both property damage as well as bodily injury, considering that the act also includes a minimum limit of $5 million

and that the limits are indeed minimum limits, it would be unreasonable to conclude that the Legislature only intended $1 million, at the most, to ever be allocated to property damage arising out of an accident. This is especially true given the potential for extensive property damage, including environmental cleanup, as happened here, where an accident involves a vehicle transporting hazardous materials.

A goal of the no-fault act is to ensure that automobile accident victims receive without regard to fault compensation for their injuries in the form of property protection insurance benefits. *Farmers Ins Exch v Farm Bureau Gen Ins Co of Michigan*, 272 Mich App 106, 118; 724 NW2d 485 (2006). The goal of the MCSA, in part, is "to assure that motor carriers maintain an appropriate level of financial responsibility for motor vehicles operated on public highways." 49 CFR 387.1; MCL 480.11a. These goals are not mutually exclusive; both provide the means for recompensing injury in the event of a motor vehicle accident. The MCSA is both more specific and more recent, and we hold that it creates an exception to the $1 million cap on damages established by the no-fault act. MCL 500.3121(5). We therefore conclude that the trial court erred in granting defendants' motion for summary disposition.

Plaintiff next argues that the trial court erred in denying its motion for statutory interest on the remaining $942,042.72 due from Employers on the no-fault insurance policy it issued to Initial (primary policy). Plaintiff contends that the trial court erred in declining to award plaintiff penalty interest, pursuant to MCL 500.2006. We agree.

This Court reviews de novo whether a trial court erred in denying a party's motion for summary disposition of a claim for penalty interest pursuant to MCL

500.2006. See *Angott v Chubb Group Ins*, 270 Mich App 465, 474-475; 717 NW2d 341 (2006). The determination of which statutory provision applies to a given action is purely a legal question to be resolved by statutory interpretation and reviewed by this Court de novo. *Yaldo v North Pointe Ins Co*, 217 Mich App 617, 619; 552 NW2d 657 (1996).

Michigan's Uniform Trade Practices Act, MCL 500.2006, provides in relevant part:

> (1) A person must pay on a timely basis to its insured, an individual or entity directly entitled to benefits under its insured's contract of insurance, or a third party tort claimant the benefits provided under the terms of its policy, or, in the alternative, the person must pay to its insured, an individual or entity directly entitled to benefits under its insured's contract of insurance, or a third party tort claimant 12% interest, as provided in subsection (4), on claims not paid on a timely basis. Failure to pay claims on a timely basis or to pay interest on claims as provided in subsection (4) is an unfair trade practice unless the claim is reasonably in dispute.
>
> * * *
>
> (4) If benefits are not paid on a timely basis the benefits paid shall bear simple interest from a date 60 days after satisfactory proof of loss was received by the insurer at the rate of 12% per annum, if the claimant is the insured or an individual or entity directly entitled to benefits under the insured's contract of insurance. If the claimant is a third party tort claimant, then the benefits paid shall bear interest from a date 60 days after satisfactory proof of loss was received by the insurer at the rate of 12% per annum if the liability of the insurer for the claim is not reasonably in dispute, the insurer has refused payment in bad faith and the bad faith was determined by a court of law.

" 'The purpose of the penalty interest statute is to penalize insurers for dilatory practices in settling meri-

torious claims, not to compensate a plaintiff for delay in recovering benefits to which the plaintiff is ultimately determined to be entitled.' " *Angott, supra* at 479, quoting *Arco Industries Corp v American Motorists Ins Co (On Second Remand, On Rehearing)*, 233 Mich App 143, 148; 594 NW2d 74 (1998); see also *McCahill v Commercial Union Ins Co*, 179 Mich App 761, 779; 446 NW2d 579 (1989) (noting that the penalty interest statute "is intended to provide a penalty to be assessed against recalcitrant insurers who procrastinate or are dilatory in paying meritorious claims in bad faith"), and *Sharpe v Detroit Auto Inter-Ins Exch*, 126 Mich App 144, 150; 337 NW2d 12 (1983) (noting that "the intent of the interest provision for overdue payments is not to compensate the insured, but rather to penalize an insurance company that is dilatory in paying a claim").[5]

The *Angott* Court discussed the "reasonably in dispute" language included in MCL 500.2006(1):

> This language [in 500.2006(1)] indicates that the entire claim must be in reasonable dispute before an insurer can escape without paying any penalty interest, and not just portions of the claim. The statute does not provide that penalty interest is to be imposed "unless the *extent or amount* of the claim is reasonably in dispute." In other words, if the insurer *reasonably* argues that no payment is due under a policy, then no penalty interest can be imposed after resolution of the dispute by a court or through appraisal, but if some portions of the claim, properly presented, are beyond reasonable dispute, timely payment must be made to that extent to avoid penalty interest, leaving the reasonably disputed portions subject to later

---

[5] Generally, "[p]ersonal protection insurance benefits are payable as loss accrues," and are overdue if not paid within 30 days after the insurer receives reasonable proof of loss. MCL 500.3142(2). MCL 500.3142(3) provides that "[a]n overdue payment bears simple interest at the rate of 12% per annum." The no-fault act does not provide a parallel provision for failure to pay property protection insurance benefits.

resolution without application of penalty interest. [*Angott,
supra* at 481 (emphasis in original).]

Before plaintiff filed its complaint in the present
case, Employers agreed to tender the $1 million limit to
plaintiff under the primary policy on two conditions: (1)
that plaintiff supply satisfactory proof that the damage
to the overpass was at least $1 million and (2) that
plaintiff sign a complete release of liability for both
Employers and Initial. Plaintiff did not respond to
Employers' request and filed its complaint in the Wayne
Circuit Court approximately nine months later. The
lower court record reveals that plaintiff did not submit
proof of the amount of damage done to the overpass and
adjoining structures before it filed its complaint. Fur-
thermore, plaintiff's complaint specifically requested
immediate payment of "in excess of $3.5 million in
damages." However, at some point during the proceed-
ings, Employers made payments totaling $57,957.28 to
various environmental cleanup companies on behalf of
plaintiff, leaving a remaining balance of $942,042.72.
Plaintiff argued in its first motion for summary dispo-
sition that, because the primary policy and an addi-
tional umbrella policy were in effect on the date of the
accident and because each of the policies covered *both*
the semi-tractor and the trailer, Employers was liable
for the $1 million in damages under *each* of the policies
for *each* of the vehicles. At the first hearing on the
parties' motions for summary disposition, the trial
court concluded that the no-fault act was plaintiff's sole
avenue of recovery for property damage. However, the
trial court requested that the parties address whether
the October 6, 2003, accident could be classified as a
single- or multi-vehicle accident. On June 21, 2006, the
trial court entered an order requiring "plaintiff and
[Employers] to execute a mutually agreeable Release
preserving each party's rights to appeal those decisions

adverse to it, and upon execution of such Release that [Employers] pay sum of $942,042.72, its remaining balance under [the primary policy]." However, the trial court declined to impose interest on the claim.

We conclude that the remaining portion of the claim, approximately $942,042.72, was not reasonably in dispute when the trial court entered the June 21, 2006, order. Notwithstanding the other arguments raised in its motion for summary disposition, plaintiff requested immediate payment of the remaining balance, noting that the amount was not in dispute. In response, defendants admitted that the remaining balance was not in dispute and offered to tender the balance upon plaintiff executing a release. As of June 21, 2006, Employers could not reasonably argue that no payments were due under the primary policy. The remaining balance, $942,042.72, was properly presented by plaintiff and was beyond reasonable dispute. Thus, "timely payment must [have been] made to that extent to avoid penalty interest, leaving the reasonably disputed portions subject to later resolution without application of penalty interest." *Angott, supra* at 481. Accordingly, even though plaintiff argued that the MCSA provided additional levels of protection and that the accident could be classified as a multi-vehicle accident giving rise to additional property protection benefits, the first $1 million of the claim was not reasonably in dispute. Only plaintiff's remaining claim of $2.5 million was reasonably in dispute at that time. Moreover, nothing in the penalty interest statute provides that an entity directly entitled to benefits under the insured's contract of insurance is required to sign a release before receiving such benefits. MCL 500.2006(1). Further, defendants have not cited any authority in support of their position that an insurer can avoid paying penalty interest by requiring a party to execute a release before

payment of a claim. Accordingly, we reverse the portion of the trial court's order denying plaintiff interest, and remand for a determination of the amount of interest due from Employers under MCL 500.2006(4). We direct the trial court to order Employers to pay interest at the rate of 12 percent per annum from a date 60 days after satisfactory proof of loss was received.

Plaintiff finally argues that it is entitled to interest under MCL 600.6013. However, a review of plaintiff's brief on appeal reveals that plaintiff failed to properly brief the issue. A party's failure to brief the merits of an issue constitutes abandonment of the issue. *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999). Accordingly, plaintiff has abandoned this issue, and we decline to address it on appeal.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

Murphy, J., concurred.

Whitbeck, C.J. (*concurring in part and dissenting in part*). I concur with the majority's conclusion that the trial court erred by denying the Michigan Department of Transportation's (MDOT) motion for statutory interest based on Employers Mutual Insurance Company's (Employers) failure to unconditionally tender the $1 million under Initial Transport, Inc.'s (Initial), no-fault insurance policy.

I write separately, however, because I disagree with the majority's conclusion that the Motor Carrier Safety Act (MCSA), MCL 480.11 *et seq.*, provides property protection benefits separate and above the $1 million limit set by the Michigan no-fault act, MCL 500.3101 *et seq.* I believe that the MCSA is a regulatory act that simply (1) sets forth minimum amounts of financial

responsibility for certain motor carriers and (2) imposes a civil penalty for the failure to comply with those minimum requirements. I disagree with the majority's conclusion that the MCSA creates a private remedy for a third party against an insured or an insurer. Indeed, the majority concedes that no such remedy is provided anywhere in that statutory scheme. I would hold that the no-fault act is the exclusive remedy available to MDOT for the property damage sustained in this case. Therefore, I would reverse and remand on the interest issue, but affirm on the benefits-limit issue.

As the majority points out, neither party disputes that approximately $3.5 million in damage was done to the overpass as a result of the October 6, 2003, accident. Further, the parties do not dispute that, because the semi-tractor and the trailer are insured under one policy of insurance and only one accident occurred, MDOT is precluded from collecting more than $1 million from Employers under the no-fault act, which provides in pertinent part as follows:

> Property protection insurance benefits consist of the lesser of reasonable repair costs or replacement costs less depreciation and, if applicable, the value of loss of use. However, *property protection insurance benefits paid under 1 policy for damage to all tangible property arising from 1 accident shall not exceed $1,000,000.00.*[1]

By its plain language, § 3121(5) of the no-fault act expressly limits liability for damage to property arising out of a motor vehicle accident to $1 million.

What the parties are disputing is whether MDOT's entire allowable recovery is limited to the $1 million no-fault cap on property protection insurance benefits or whether MDOT may obtain additional recovery

---

[1] MCL 500.3121(5) (emphasis added).

under the MCSA. MDOT advocates the latter and contends that the MCSA provides an additional layer of benefits that are separate and distinct from the $1 million property protection insurance benefit limit set forth under the no-fault act. Specifically, MDOT argues that because MCL 480.11a requires a transporter of hazardous materials to obtain certain minimum levels of financial security, it is entitled to recover for damages in an amount that exceeds the $1 million no-fault limit. I disagree. I do not agree that the Legislature, by adopting the MCSA, intended to impose additional liability over and above the $1 million limit on property protection insurance benefits contained in the no-fault act.

The purpose of the MCSA is described in its title as follows:

> An act to promote safety upon highways open to the public by regulating the operation of certain vehicles; to provide consistent regulation of these areas by state agencies and local units of government; . . . to establish certain violations of shippers offering certain materials for transportation; . . . [and] to provide penalties for the violation of this act . . . .[2]

To effectuate this purpose, in enacting the MCSA, Michigan adopted by reference portions of the federal Motor Carrier Safety Act and the federal motor carrier safety regulations.[3] The purpose of the federal motor carrier safety regulations is to prescribe "the minimum levels of financial responsibility required to be maintained by motor carriers of property operating motor

---

[2] Title of MCL 480.11 *et seq.* A title is not binding authority for construing an act, but this Court has recognized that a title can be useful for interpreting statutory purpose and scope. *King v Ford Motor Credit Co*, 257 Mich App 303, 311-312; 668 NW2d 357 (2003).

[3] MCL 480.11a(1).

vehicles in interstate, foreign, or intrastate commerce" and to "create additional incentives to motor carriers to maintain and operate their vehicles in a safe manner and to assure that motor carriers maintain an appropriate level of financial responsibility for motor vehicles operated on public highways."[4]

49 CFR part 387 is among the many portions of the federal motor carrier safety regulations adopted by the MCSA. Under 49 CFR 387.7(a), "[n]o motor carrier shall operate a motor vehicle until the motor carrier has obtained and has in effect the minimum levels of financial responsibility." 49 CFR 387.9(3) requires private transporters of hazardous material, such as oil or gasoline, to maintain a minimum of $1 million in financial responsibility.[5] A violation of the federal rules is punishable by a "civil penalty of no more than $11,000 for each violation."[6] Further, "any person, driver, or motor carrier . . . who violates . . . or permits or requires any person to violate [the MCSA] or a rule promulgated under [the MCSA], is responsible for a state civil infraction and may be ordered to pay a fine of not more than $250.00 for each violation."[7]

MDOT argues that because 49 CFR 387.9 sets forth minimum levels of financial responsibility based on the type of material transported by a motor carrier, an injured third party has access to an *additional* level of security. In other words, MDOT argues that the Legislature, by adopting the federal financial responsibility

---

[4] 49 CFR 387.1.

[5] 49 CFR 387.9 also requires a transporter of liquefied petroleum to maintain a minimum of $5 million in financial responsibility. The implications of this $5 million requirement, however, are not presented for resolution before this panel.

[6] 49 CFR 387.17.

[7] MCL 480.17(1).

requirements, intended an exception to the $1 million limit on property protection benefits set forth in the no-fault act. I find this argument unpersuasive.

Although the MCSA sets forth minimum amounts of financial responsibility for certain motor carriers, the MCSA does not create any private cause of action. Further, there is no indication in the MCSA, or in any other statute, that Michigan's adoption of the federal financial responsibility requirements for certain motor carriers creates additional coverage or liability exposure beyond the requirements of the no-fault act. Nowhere does the MCSA or the no-fault act state that the $1 million financial responsibility requirement is recoverable property protection insurance *in addition* to the no-fault act's $1 million property damage limitation. Moreover, the MCSA does not provide any method for asserting a cause of action for damages. As stated, the only "liability" that may be imposed under the MCSA is a fine or a penalty for failing to comply with the federal regulations adopted in the MCSA. I conclude, therefore, that the Legislature has exclusively reserved to the no-fault act the rights of third parties to recover for damage to tangible property.

The no-fault act requires that the owner or registrant of a motor vehicle maintain benefits for property protection insurance.[8] The goal of the no-fault act is to ensure that automobile accident victims receive compensation for their injuries in the form of property protection insurance benefits without regard to fault.[9] Therefore, certain minimum levels of coverage are mandated as a prerequisite for automobile registration

---

[8] MCL 500.3101(1).

[9] *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 36-37; 528 NW2d 681 (1995); *Farmers Ins Exch v Farm Bureau Gen Ins Co of Michigan*, 272 Mich App 106, 118; 724 NW2d 485 (2006).

in this state.[10] Michigan's financial responsibility act and the no-fault act require minimum liability insurance coverage in the amount of $20,000 for injury or death of one person in any one accident, $40,000 for injury or death of 2 or more people in any one accident, and $10,000 for injury to or destruction of the property of others.[11] In light of these general minimum coverage requirements, I agree with the majority's statements that the only reasonable purpose for requiring insurance is to effectuate coverage of risk and that injured parties ought to be able to recover for damages under an available policy. However, I do not agree that these premises lead to the conclusion that the MCSA has implicitly created an exception to the $1 million no-fault cap on recovery for property damage. Indeed, the only exception that I see in the MCSA is an exception for motor carriers to the general minimum policy requirements for ordinary vehicles stated above.[12]

As the majority correctly states, the transport of hazardous property poses a greater risk in accidents

---

[10] MCL 257.518; MCL 500.3009; MCL 500.3131.

[11] MCL 500.3009(1) states:

An automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for property damage, bodily injury, or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle shall not be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless the liability coverage is subject to a limit, exclusive of interest and costs, of not less than $20,000.00 because of bodily injury to or death of 1 person in any 1 accident, and subject to that limit for 1 person, to a limit of not less than $40,000.00 because of bodily injury to or death of 2 or more persons in any 1 accident, and to a limit of not less than $10,000.00 because of injury to or destruction of property of others in any accident.

[12] See MCL 500.3009(1).

than that posed by the transport of nonhazardous materials. This merits the imposition of additional levels of minimum protection. Therefore, that the MCSA requires higher minimum levels of coverage for vehicles transporting hazardous materials merely recognizes that such vehicles are more likely to cause significant damage that may drastically exceed Michigan's generally applicable minimum levels of coverage.

Further, I find it significant that the MCSA's $1 million financial responsibility requirement is intended to cover the motor carrier for property damage, *as well as* for bodily injuries,[13] while the $1 million no-fault act limit is specifically aimed at property damage alone. Thus, the goals of the two acts notably differ. The goal of the MCSA is to set forth *minimum levels* of financial responsibility required to be maintained by motor carriers for all types of damage, including both property damage and bodily injury, to ensure that sufficient amounts of insurance will be available to cover potentially catastrophic accidents. Conversely, the no-fault act in MCL 500.3121(5) simply provides that an insurer is responsible for paying no more than $1 million to cover property damage. Thus, § 3121(5) sets forth the *maximum* recovery available under no-fault law for property damage. Stated differently, the MCSA requires a $1 million *minimum* level of financial responsibility to cover *all* potential damage caused by certain motor carriers, but in the event such a motor carrier causes property damage, recovery for that *property damage* is nevertheless limited by the $1 million no-fault *maximum* recovery allowance.

As can be seen in this case, property damage alone caused by an accident involving a motor carrier of hazardous material can well exceed the $1 million

---

[13] 49 CFR 387.1; MCL 480.11a.

no-fault act limit. But it is within the power of the Legislature, not this Court, to create an exception to the $1 million property-damage limit for motor carriers if such an exception is indeed deemed warranted. Absent express direction from the Legislature, the financial responsibility requirements must be read within the framework of the no-fault act. The MCSA only requires that a motor carrier have a minimum level of financial responsibility. There is no reason to suppose that the Legislature, by enacting the MCSA and adopting portions of the federal regulations, intended to impliedly provide an exception to the limits on property damage benefits set forth in § 3121(5) of the no-fault act.

Under the plain language of § 3121(5) of the no-fault act, the state can only recover $1 million in property protection benefits for this one accident covered under one policy. The $4 million coverage provided in the umbrella policy cannot provide additional property-damage recovery to the state contrary to the statutory limit. The no-fault act is MDOT's sole remedy because the MCSA is merely a regulatory act setting forth the minimum amount of coverage necessary for a carrier of hazardous material. Therefore, in my opinion, the trial court properly denied MDOT's motion for summary disposition and granted defendants' motion for summary disposition because the MCSA does not provide additional property protection benefits to MDOT. I would hold that the property protection insurance benefits of the no-fault act are MDOT's exclusive remedy for payment for the property damage sustained in this case.

I would reverse and remand on the interest issue, but affirm on the benefits-limit issue.